UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

MARK W. DOBRONSKI,

Plaintiff,

v.

EVERQUOTE, INC.,

STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY,

CHURCH INSURANCE AGENCY, INC.,

BRIAN WEST INS AGENCY, INC.,

SURETY AUTO GROUP, LLC, d/b/a RAINBOW INSURANCE,

PHILIP BARRETO,

MICHAEL DAVID CHURCH,

VIVIANNA MARIE MOBLEY,

ZANDER LUCAS SHANAFELT, and

BRIAN JAMES WEST,

Defendants.

---

**COMPLAINT**

NOW COMES the Plaintiff, MARK W. DOBRONSKI, appearing *in propria*

*persona*, and for his complaint against the above-named Defendants, alleges:

1. Plaintiff brings this consumer protection action to recover for a coordinated telemarketing scheme in which Defendants, directly and through persons acting on their behalf, placed repeated unlawful calls to Plaintiff's charged residential and wireless telephone lines, falsely represented themselves to be associated with a federal government agency and government benefits program, used deceptive pretexts and misleading caller-identification information, circumvented Plaintiff's do-not-call protections, and transferred Plaintiff as an insurance lead to downstream sellers and agents, all in violation of the Telephone Consumer Protection Act of 1991 ("TCPA"), 47 U.S.C. § 227, *et seq.*, the Michigan Home Solicitation Sales Act ("MHSSA"), M.C.L. § 445.101, *et seq.*, the Michigan Consumer Protection Act ("MCPA"), M.C.L. § 445.901, *et seq.*, and the Florida Telemarketing Sales Act ("FTSA"), Fla. Stat. § 501.059.

Parties

2. Plaintiff MARK W. DOBRONSKI ("Dobronski") is an individual, of the age of majority, a citizen of the United States of America, has a domicile in Orange County, Florida, and has a residence in Washtenaw County, Michigan.

3. Defendant EVERQUOTE, INC. ("EverQuote") is a corporation organized and existing under the laws of the State of Delaware, with a principal office

located in Cambridge, Massachusetts, which is registered and qualified to do business in the State of Michigan, with a registered office located at 40600 Ann Arbor Road East, Suite 201, Plymouth, Michigan 48170-4675.

4. Defendant STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY ("State Farm") is a corporation organized and existing under the laws of the State of Illinois, with a principal office located at Bloomington, Illinois, which is registered and qualified to do business in the State of Michigan, with a registered office located at 3410 Belle Chase Way, Suite 600, Lansing, Michigan 48911-4274

5. Defendant CHURCH INSURANCE AGENCY, INC. ("CIA") is a corporation organized and existing under the laws of the State of Michigan, with a principal office located at 2740 East Lansing Drive, East Lansing, Michigan 48823-2898.

6. Defendant BRIAN WEST INS AGENCY, INC. ("BWIA") is a corporation organized and existing under the laws of the State of Florida, with a principal office located at 2320 Dairy Road, Suite 102, Melbourne, Florida 32904-5208.

7. Defendant SURETY AUTO GROUP, LLC ("SAG") is a limited liability company organized and existing under the laws of the State of Florida, with a principal office located at 5471 West Atlantic Boulevard, Margate, Florida 33063-

5210.

8. Defendant PHILIP BARRETO ("Barreto") is an individual, of the age of majority, and resides at 3307 West Saint Conrad Street, Tampa, Florida 33607-2135.

9. Defendant MICHAEL DAVID CHURCH ("Church") is an individual, of the age of majority, and resides at 6435 Ridgepond Place, East Lansing, Michigan 48823-9777.

10. Defendant VIVIANNA MARIE MOBLEY ("Mobley") is an individual, of the age of majority, and resides at 778 Old Country Road Southeast, Palm Bay, Florida 32909-6882.

11. Defendant ZANDER LUCAS SHANAFELT ("Shanafelt") is an individual, of the age of majority, and resides at 3332 Rolston Road, Fenton, Michigan 48430-1034.

12. Defendant BRIAN JAMES WEST ("West") is an individual, of the age of majority, and resides at 6317 Spinaker Drive, Rockledge, Florida 32955-5781.

<u>Jurisdiction</u>

13. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

14. This Court has limited personal jurisdiction over Defendants EverQuote,

BWIA, and SAG, pursuant to M.C.L. § 600.715, as a result of the defendants transacting any business within the state; and/or, doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

15. This Court has general personal jurisdiction over Defendant CIA, pursuant to M.C.L. 600.711, as a result of the entity being incorporated under the laws of this state and the carrying on of a continuous and systematic part of its general business within the state.

16. This Court has limited personal jurisdiction over Defendants Barreto, Mobley, and West , pursuant to M.C.L. § 600.705, as a result of the defendants transacting any business within the state; and/or doing or causing any act to be done, or consequences to occur, in the state resulting in an action for tort.

17. This Court has general personal jurisdiction over Defendants Church and Shanafelt, pursuant to M.C.L. § 600.701, as a result of the defendants having a presence in the state at the time when process is served; and/or having a domicile in the state at the time when process is served.

Venue

18. Venue is proper in this Court, pursuant to 28 U.S.C. § 1391(b)(2), as the tortious or illegal telephone calls complained of herein were received by Plaintiff in this judicial district, to wit: at Plaintiff's residence in Washtenaw County, Michigan.

## Preliminary Statement

19. As the Supreme Court recently explained, "Americans passionately disagree among many things. But they are largely united in their disdain for robocalls." *Barr v. American Association of Political Consultants LLC*, 140 S. Ct. 2335, 2343 (2020).

20. In response to widespread public outrage over intrusive telemarketing calls to homes and businesses, the United States Congress acted to prevent persons like Defendants from invading American citizens' privacy and to prevent abusive "robo-calls" by enacting the TCPA.

21. In regard to such telephone solicitations, Senator Hollings of South Carolina, the primary sponsor of the TCPA, explained, "computerized calls are the scourge of modern civilization. They wake us up in the morning; they interrupt our dinner at night; they force the sick and elderly out of bed; they hound us until we want to rip the telephone right out of the wall . . . these computerized telephone calls threaten our personal safety . . . These machines are out of control, and their use is growing by 30 percent every year. It is telephone terrorism, and it has got to stop...." *In the Matter of Rules and Regulations Implementing the Telephone Consumer Protection Act of 1991*, 17 FCC Rcd. 17459, 17474, fn. 90, 2002 WL 31083949 (2002), quoting 137 Cong. Rec. 30,821-30,822 (Nov. 7, 1991).

22. Congress has found that interstate telemarketing fraud has become a problem of such magnitude that the resources of the Government are not sufficient to ensure adequate consumer protection from such fraud.

23. As a result, in enacting the TCPA, Congress intentionally created a legally enforceable bounty system, not unlike *qui tam* statutes, to incentivize the assistance of aggrieved private citizens to act as "private attorneys general" in enforcing federal law.

General Allegations

24. Plaintiff's residential and cellular telephone lines have been besieged with telemarketing calls hawking such things as alarm systems, Google listings, automobile warranties, health insurance, life insurance, credit cards, and even financial miracles from God. Some calls are blatant scams, including calls purportedly from the Social Security Administration, the U.S. Drug Enforcement Administration, and other government agencies, some claiming that arrest warrants have been issued against Plaintiff for alleged drug trafficking and money laundering activities.

25. Plaintiff's telephone numbers include 407-***-**56 ("56 Number"), 734-***-**21 ("21 Number") and 734-***-**00 ("00 Number") (collectively "Plaintiff's Numbers").

26. Plaintiff's Numbers are all telephone numbers for which the service is charged on a per call and per minute basis.

27. Plaintiff's 56 Number is listed on the National Do-Not-Call Registry and has been so listed continuously since May 16, 2025 and at all times subsequent thereto and relevant hereto.

28. Plaintiff's 00 Number is listed on the National Do-Not-Call Registry and has been so listed continuously since June 1, 2004 and at all times subsequent thereto and relevant hereto.

29. Plaintiff uses each of Plaintiff's Numbers for personal, family, and household communications, and not for business purposes.

30. By listing his telephone numbers on the National Do-Not-Call Registry, Plaintiff has given constructive notice to telemarketers and sellers subject to do-not-call, including the Defendants, that Plaintiff does not wish to receive telephone solicitations or robocalls at his residential telephone numbers.

31. Plaintiff's telephone service is provided via Voice Over Internet Protocol ("VoIP") technology and interconnects with the public switched telephone network via a broadband Internet connection instead of a conventional telephone line, which allows Plaintiff the ability to answer calls at the residence he is staying at. In the instances of the illegal telemarketing calls alleged in this Complaint, the calls were

received by Plaintiff while he was at his residence located in Washtenaw County, Michigan.

32. Courts are legally bound to give great deference to the FCC's interpretations of the TCPA and its own regulations. *FCC v. WNCN Listeners Guild*, 450 U.S. 582, 598, 101 S.Ct. 1266, 1276, 67 L.Ed.2d 521 (1981) ("the construction of a statute by those charged with its execution should be followed unless there are compelling indications that it is wrong....").

33. The FCC has issued a declaratory ruling defining "called party" as "the subscriber, i.e., the consumer assigned the telephone number dialed and billed for the call, or the non-subscriber customary user of a telephone number included in a family or business calling plan." *In the Matter of Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 8000-8001, 2015 WL 4387780, at *26, ¶ 73 (2015).

34. Plaintiff is the customary user of the called telephone line, is the one that was the actual recipient of the telephone calls at issue in this complaint, and suffered the nuisance and invasion of privacy of same. Thus, Plaintiff has standing to bring this action for alleged violations of TCPA's provisions. *Leyse v. Bank of America Nat. Ass'n*, 804 F.3d 316, 324 (3d Cir., 2015).

35. At no time relevant hereto has Plaintiff or any other authorized person requested, consented, permitted, or authorized the contact from the Defendants.

36. At no time has Plaintiff provided permission to the Defendants to engage in telephone solicitation with the Plaintiff via telephone.

37. At no time has Plaintiff provided “prior express consent” or “prior express written consent” (as those terms are defined under the TCPA and as interpreted by the FCC) for any of the Defendants or anyone acting on behalf of the Defendants to initiate any telephone call that includes or introduces an advertisement or constitutes telemarketing, using an automatic telephone dialing system or an artificial or prerecorded voice, to Plaintiff’s cellular telephone number.

38. At no time has Plaintiff had an “established business relationship” (as that term is defined under the TCPA and as interpreted by the FCC) with the Defendants.

39. The FCC has declared that a necessary element for a person to provide “consent” is that the person must knowingly and voluntarily provide the telephone number at which they are authorizing telemarketing calls to be received at. For example, capturing a caller’s telephone number by a Caller ID or ANI device cannot be considered consent to receive telemarketing calls. *In re Rules and Regulations Implementing the TCPA*, 7 FCC Rcd. 8752, 8769, 1992 WL 690928, at *11, ¶ 31 (1992).

40. The FCC has further declared that persons who knowingly release their

phone numbers have in effect given their invitation or permission to be called at the number which they have given, if the caller is making calls within the scope of the consent given, and absent instructions to the contrary. *In re Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 8028, 2015 WL 4387780, at *47, ¶ 141 (2015).

41. At no time has Plaintiff released his phone number to the Defendants in order to have given invitation or permission to be called at that number for any telephone call that includes or introduces an advertisement or constitutes telemarketing, or any call using an automatic telephone dialing system or an artificial or prerecorded voice.

42. Similarly, for purposes of an "established business relationship," the FCC has declared that a consumer inquiry cannot be considered to create a business relationship where the consumer's number has been captured absent that consumer's express invitation or permission to be contacted at the captured number. *In re Rules and Regulations Implementing the TCPA*, 7 FCC Rcd. 8752, 8771, 1992 WL 690928, at *13, n. 67 (1992).

43. Consent cannot be "presumed." The TCPA and the Commission's rules plainly require express consent, not implied or "presumed" consent. *In re Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 7991, 2015 WL 4387780,

at *20, ¶ 52 (2015).

44. The TCPA places no affirmative obligation on a called party to opt out of calls to which he or she never consented; the TCPA places responsibility on the caller alone to ensure that he or she has valid consent for each call made. *In re Rules and Regulations Implementing the TCPA*, 30 FCC Rcd. 7961, 8004, 2015 WL 4387780, at *29, ¶ 81 (2015).

45. The FCC has declared that "[p]urporting to obtain consent during the call... does not constitute the *prior* consent necessary to deliver the message in the first place as the request... is part of the telemarketing." *In re Rules and Regulations Implementing the TCPA*, 18 FCC Rcd. 14014, 14019, 2003 WL 21517853, at *49, ¶ 142 (2003) [Emphasis as in original].

46. The FCC has clarified that sellers may be held vicariously liable for violations of the TCPA by third-party telemarketers that initiate calls to market the seller's products or services, declaring as follows:

> "[A] company on whose behalf a telephone solicitation is made bears the responsibility for any violation of our telemarketing rules and calls placed by a third party on behalf of that company are treated as if the company itself placed the call."

*In re Rules and Regulations Implementing the TCPA, Request of State Farm Mut. Auto. Ins. Co. for Clarification & Declaratory Ruling*, 20 FCC Rcd. 13664, 13667,

2005 WL 1981564, at *3, ¶ 7 (2005).

47. A seller may be liable for violations by its representatives under a broad range of agency principles, including not only formal agency, but also principles of apparent authority and ratification. *In re Dish Network,* 28 FCC Rcd. 6574, 6584, 2013 WL 1934349, at *9, ¶ 28 (2013).

48. Pursuant to 47 U.S.C. § 217, the act, omission, or failure of any officer, agent, or other person acting for or employed by a common carrier or user, acting within the scope of his employment, shall in every case also be deemed to be the act, omission, or failure of such carrier or user as well as that of the person.

49. Parties are acting in concert when they act in accordance with an agreement to cooperate in a particular line of conduct or to accomplish a particular result. The agreement need not be expressed in words or may be implied and understood to exist from the conduct itself. Whenever two or more persons commit tortious acts in concert, each becomes subject to liability for the acts of the others, as well as for his own acts. In either case, the defendant's embrace of the actor's purpose or design—whether by agreement or by action—renders the defendant liable for the underlying tort.

50. The liability of coconspirators to civil damages is joint and several. All those who, in pursuance of a common plan to commit a tortious act actively take part

in it and further it by cooperation or request, or who lend aid or encouragement to the wrongdoer, or who ratify and adopt the acts done for their benefit, are equally liable with him.

51. When considering individual corporate officer liability, other Courts have agreed that a corporate officer involved in the telemarketing at issue may be personally liable under the TCPA. *See*, *e.g.*, *Jackson Five Star Catering, Inc. v. Beason,* No. 10-10010, 2013 WL 5966340, *4 (E.D. Mich. Nov. 8, 2013) ("[M]any courts have held that corporate actors can be individually liable for violating the TCPA where they had direct, personal participation in or personally authorized the conduct found to have violated the statute.") (internal citation omitted); *Maryland v. Universal Elections*, 787 F. Supp. 2d 408, 415-16 (D.MD. 2011) ("If an individual acting on behalf of a corporation could avoid individual liability, the TCPA would lose much of its force.").

52. It is well settled under Michigan law that corporate employees and officials are personally liable for all tortious and criminal acts in which they participate, regardless of whether they are acting on their own behalf or on behalf of a corporation. A corporate officer or director is, in general, personally liable for all torts which he authorizes or directs or in which he participates, notwithstanding that he acted as an agent for the corporation and not on his own behalf.

53. For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of invasion of privacy and intrusion on Plaintiff's right of seclusion.

54. For each and every call alleged herein initiated to Plaintiff's telephone line, Plaintiff suffered the injury of the occupation of the telephone line by unwelcome calls, making the phone unavailable for legitimate callers or outgoing calls, including emergency calls, when the telephone line was seized by Defendants' calls.

55. For each and every call alleged herein initiated to Plaintiff's telephone line, Defendants caused an injury in the form of a nuisance and annoyance to the Plaintiff. For calls that were answered, Plaintiff was put to the unnecessary trouble of answering them. Even for unanswered calls, Plaintiff had to deal with missed call notifications and call logs that reflected the unwanted calls. This also impaired the usefulness of these features on Plaintiff's telephone, which features are designed to inform the user of important missed communications.

56. Each and every call placed without consent by Defendants alleged herein to Plaintiff's telephone lines resulted in the injury of a trespass to Plaintiff's chattel, namely Plaintiff's telephone line and its telephone services.

57. For purposes of the TCPA, the FCC has defined "willfully or knowingly"

to mean that the violator knew that he was doing the act in question, in this case, initiating a telephone solicitation, irrespective of any intent to violate the law. A violator need not know that his action or inaction constitutes a violation; ignorance of the law is not a defense or mitigating circumstance.

<u>Allegations Specific to this Complaint</u>

58. Plaintiff pleads the overall specifics of the scheme based upon information and belief formed from Plaintiff's investigation.

59. Defendant State Farm is an insurance company selling automobile and homeowners insurance products to consumers across the United States, and including both Michigan and Florida.

60. State Farm recruits insurance agencies and insurance agents across the United States to market State Farm's insurance products.

61. State Farm encourages its insurance agencies and insurance agents to utilize telemarketing as a cost-effective method of mass marketing State Farm's products to the general public.

62. State Farm provides its insurance agencies and insurance agents with access to State Farm's computer network for purposes of quoting rates of insurance products, and for entering insurance applications and supporting the insurance agencies and insurance agents in the process of marketing State Farm's products to

prospective customers.

63. Defendants CIA and BWIA are two insurance agencies affiliated with State Farm.

64. Defendant SAG is an independent insurance brokerage which sells automobile, health, and life insurance products.

65. Defendants Church and Shanafelt are both licensed by the Michigan Department of Insurance and Financial Services as insurance agents, who are employed or affiliated with CIA.

66. Defendant Church is the President and sole director of CIA.

67. Defendant Barreto is a manager and member of SAG.

68. Defendants Barreto, Mobley and West are each licensed by the Florida Department of Financial Services as insurance agents, who are employed or affiliated with BWIA.

69. Defendant West is the President and sole director of BWIA.

70. State Farm has notified its insurance agencies and insurance agents that EverQuote is one of State Farm's approved telemarketing vendors.

71. Defendants BWIA, CIA, and SAG utilize the telemarketing and lead generation services provided by EverQuote.

72. Upon information and belief, Defendants Barreto, Church, and West

each directly and personally participated in, authorized, and controlled the telemarketing activity conducted by EverQuote, including having the ability at all times to curtail that activity.

73. Defendant EverQuote is, upon information and belief, engaged in the business of generating, soliciting, purchasing, marketing, and selling insurance leads by seeking out consumers interested in insurance products, including through outbound consumer-contact operations and call-center activity, and connects or transfers those consumers by telephone to insurance agents, carriers, and insurance-provider customers for the sale of insurance.

74. EverQuote's call center initiates telephone calls en masse using automated telephone dialing equipment and call-center dialing technology, including equipment that dials stored lists of numbers without human intervention and connects answered calls to available agents.

75. A common characteristic of the use of an automated telephone dialing system is a click or electronic sound when the called party answers the incoming call, followed by several seconds of silence, then a live telemarketer coming onto the line.

76. The objective of the automated telephone dialing system is to minimize the number of call handlers or telemarketers required at the call center, and to only connect a call handler or telemarketer to a dialed number only after the called party

is on the line, thus creating significant labor cost efficiencies for the call center.

77. EverQuote's call center agents will initiate calls to and query consumers to determine if the called consumer, or a family member, meet the pre-selection criteria set by its customers to be a suitable customer.

78. When EverQuote's call center has identified consumers who meet the pre-qualification criteria, the call center will then effect a live transfer of that consumer to one of its customer insurance agencies or agents.

The Calls

Call 1

79. On February 10, 2026, at 4:17 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 00 Number.

80. The caller identification number displayed was 734-322-9526, and the caller identification name displayed was: KATIE BUSZ.

81. Upon answering the incoming call by saying "hello," Plaintiff observed a clicking sound, and approximately 6 seconds of silence, followed by a live telemarketer introducing himself as "Sheldon from the United States Subsidy Benefits Department."

82. Upon query, Sheldon represented to Plaintiff that the United States Benefits Department is a federal government agency.

83. Sheldon stated "your number has been selected to receive a benefits check for $2,500.00... My job is to verify that you are the correct person."

84. Sheldon then sought personal identifying information from Plaintiff. Recognizing that Sheldon was engaging in a scam, and in order to attempt to better identify the caller, Plaintiff provided controlled false information to Sheldon, including a *faux* name of Kenneth Weaver.

85. Sheldon explained that "recently this year, the government has created a new program called 'Protect America' which is designed to protect all Americans," and that he was going to transfer Plaintiff to the "automobile department."

86. Sheldon then reviewed the questions that the "automobile department" was going to ask, and then told Plaintiff how to answer the questions. Sheldon told Plaintiff that, after speaking with the "automobile department," Sheldon will see to it that Plaintiff receive his benefits check.

87. The call then disconnected at 4:27 P.M.

Call 2

88. On February 10, 2026, at approximately 4:27 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 00 Number.

89. The caller identification number displayed was 203-774-9180, and the caller identification name displayed was WALLINGFORD CT.

90. The incoming call rang barely one ring and terminated before Plaintiff could answer the call. The total call duration was approximately one second.

Call 3

91. On February 10, 2026, at 4:28 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 00 Number.

92. The caller identification number displayed was 203-774-9180, and the caller identification name displayed was WALLINGFORD CT.

93. The incoming call rang one time and terminated before Plaintiff could answer the call. The total call duration was approximately seven seconds.

Call 4

94. On February 10, 2026, at 4:29 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 00 Number.

95. The caller identification number displayed was 203-774-9180, and the caller identification name displayed was WALLINGFORD CT.

96. Upon Plaintiff answering the incoming call by saying "hello," there was approximately a 3 second silence, then Plaintiff heard what sounded to be the voice of Sheldon from Call 1 asking "Yes, Mr. Kenneth. This will only take 3 or 4 minutes of your precious time" and then the call was transferred to another agent who identified himself as "John Marshall, the senior supervisor on the floor."

97. Marshall expressed “congratulations” to Plaintiff, stating that Plaintiff was going to receive $2,500 “from the government side” by check being sent to the same controlled address which Plaintiff had provided to Sheldon during Call 1.

98. Marshall then explained that he was transferring Plaintiff to the “auto insurance department” and then explained the 4 questions which Plaintiff was about to be asked and provided coaching as to precisely how Plaintiff was to answer each question.

99. Marshall explained that, after Plaintiff speaks with the “auto insurance department,” Plaintiff is to call Marshall back at 308-300-9897 and Marshall will then release Plaintiff’s $2,500 check.

100. Marshall told Plaintiff to listen to the person in the “auto insurance department” for 4 to 5 minutes, and then tell them that Plaintiff will think about the quotes and wants to confer with his family.

101. Marshall told Plaintiff that Plaintiff is not to tell the “auto insurance department” that he had been transferred to them or that Plaintiff had been offered any money, but that Plaintiff had seen an ad on Google and was responding to that ad.

102. Marshall attempted several times to transfer Plaintiff to another agent, but each attempt was unsuccessful.

103. Marshall then stated that there was a problem with Plaintiff's telephone number, that the telephone number was "on the DNC" and this was causing some of the agents not to answer. Marshall then explained that he was adding a $500 "senior citizen" benefit to Plaintiff's check, and additionally a health and a dental benefit. Marshall wished Plaintiff "congratulations." Marshall then asked Plaintiff for an alternate telephone number. Plaintiff provided Plaintiff's 21 Number to Marshall.

104. Marshall expressly acknowledged, in substance, that Plaintiff's original telephone number was on the National Do-Not-Call Registry. By thereafter requesting Plaintiff's "other" telephone number during the same telemarketing interaction, Marshall demonstrated actual knowledge of Plaintiff's anti-solicitation preference and sought to circumvent that known do-not-call election rather than honor it. Under these circumstances, any purported consent inferred from Plaintiff's furnishing of another number during the ongoing solicitation was not prior express invitation or permission, but instead the product of a telemarketer's intentional end-run around Plaintiff's known do-not-call protections.

105. Marshall told Plaintiff that he would call back to Plaintiff's 21 Number.

<u>Call 5</u>

106. On February 10, 2026, at 4:40 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 21 Number.

107. The caller identification number displayed was 203-774-9180, and the caller identification name displayed was WALLINGFORD CT.

108. Upon answering the incoming call by saying "hello," Plaintiff noted approximately two seconds of silence, followed by the same individual again identifying himself as John Marshall.

109. Marshall stated to Plaintiff: "This is your day... You have received free benefits from the Government... Free medication, unemployment benefits and senior citizen benefits. A great congratulation to you. Do you recall my direct line? The number is 308-300-9897. After the verification call give me a call back at my direct line. When they ask you questions, tell them that "yes" you have a car and that you have no insurance. You don't have to buy anything. Talk for 6 to 7 minutes total. Tell them that nobody transferred you, you saw an ad on Google."

110. Marshall then transferred Plaintiff's call to a recorded message that stated "Thank you for calling for a new auto insurance quote. Please press 1 if you are currently insured. Please press 2 if you are currently uninsured." Plaintiff pressed no buttons, but apparently Marshall did. The recorded message then stated "No agent is available" and disconnected.

<u>Call 6</u>

111. On February 10, 2026, at 4:46 P.M., Defendant EverQuote or its agent

initiated a telephone call to Plaintiff's 00 Number.

112. The caller identification number displayed was 203-774-9180, and the caller identification name displayed was WALLINGFORD CT.

113. The incoming call rang two times and terminated before Plaintiff could answer the call. The total call duration was approximately ten seconds.

<u>Call 7</u>

114. On February 10, 2026, at 4:47 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 00 Number.

115. The caller identification number displayed was 308-300-9897, and the caller identification name displayed was NORTH JULESB NE.

116. Upon answering the incoming call by saying "hello," Plaintiff noted approximately two seconds of silence, followed by the same individual again identifying himself as John Marshall.

117. Marshall stated to Plaintiff: "Yeah, hi Mr. Kenneth, this is John Marshall once again. This is my direct line number. Did you hang up the call from there sir? What happened? Oh no, sir, in that case, you have to stay on the line, right? You know the Government is providing you so many benefits, right. They're providing so many money, right. For that reason you have to keep some patience. You have to stay there for 4 to 5 minutes." Plaintiff explained that he had received a recording

that no agent was available.

118. Marshall explained that he was going to call Plaintiff back from his "company number" because "it is a policy" that he cannot connect Plaintiff from Marshall's cell phone.

Call 8

119. On February 10, 2026, at 4:49 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 21 Number.

120. The caller identification number displayed was 203-774-9180, and the caller identification name displayed was WALLINGFORD CT.

121. Upon answering the incoming call by saying "hello," Plaintiff noted approximately three seconds of silence, followed by the same individual again identifying himself as John Marshall.

122. Marshall explained to Plaintiff to "please keep patience, ok? If they stop recording, don't worry, ok, please keep stay there, I will hang up from my side and I will reconnect once again. You don't have to hang up from your side. OK? Yes, Mr. Kenneth, you know Government is providing you multiple benefits. Right. For that reason, you have to keep some patience, sir. A great congratulation to you once again, Mr. Kenneth. Yes, Mr. Kenneth, so now I'm going to connect you once again. Please keep patient, don't hang up the call. And, remember when they will pick up

the call, please tell them, I am looking for a quote, I am looking for a better quote. Remember, nobody has transferred you. You've seen a Google ad and came here, ok? Okay, Okay, here we go. Just be on the line. Please bear with me."

123. Marshall then transferred Plaintiff to the same recorded message as in Paragraph 109. Once again, Plaintiff received a recorded message stating "no agent is available at this time." Marshall immediately came back on the line and said "Don't worry, Mr. Kenneth, I'm still there for you... I'm going to transfer you now to a different line. I will help you get your money sir, $5,000 you are going to receive." Marshall then complained about "how busy these people are responding to calls."

124. Marshall then transferred Plaintiff to another recorded message stating "Thank you, this call is going to be transferred to one of our trusted insurance partners.... I found a match. This call is going to be transferred to a top insurance partner."

125. The line began to ring and was answered by an individual identifying himself as "This is Zander from State Farm." Zander noted that the connection had lots of static and asked for Plaintiff's telephone number so that he could call Plaintiff back. Plaintiff provided Zander with Plaintiff's 21 Number. The call terminated.

<u>Call 9</u>

126. On February 10, 2026, at 4:55 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 21 Number; the precise time of call initiation being 16:55:31.

127. The caller identification number displayed was 203-774-9180, and the caller identification name displayed was WALLINGFORD CT.

128. The incoming call rang three times and terminated before Plaintiff could answer the call. The total call duration was approximately thirteen seconds.

Call 10

129. On February 10, 2026, at 4:55 P.M., Defendant Shanafelt initiated a call to Plaintiff's 21 Number; the precise time of call initiation being 16:55:39.

130. The caller identification number displayed was 517-351-5433, and the caller identification name displayed was STATE FARM.

131. Upon answering the incoming call, the caller identified himself as "Zander from State Farm."

132. Plaintiff inquired of Zander as to "guy that transferred me to you – he barely spoke English; where was he, Pakistan or where?" Zander responded "he was just a lead company, he does not work in this office, he just transfers calls to this office."

133. Zander asked for Plaintiff's name, address, date of birth, and a Michigan

driver's license number. Plaintiff provided a false name of Charles Livernois and other controlled identifying information.

134. Plaintiff again asked questions of Zander about the lead generator. Zander explained that his company pays the lead generator to transfer leads to them. Plaintiff explained to Zander that the lead generator had promised to pay Plaintiff $5,000.00 just to receive a quote. Plaintiff explained the bizarre nature of the discussions Plaintiff had with the lead generator. Zander explained that he "was not sure about the $5,000.00; I am not sure what the guy was talking about."

135. Zander disclosed that the lead generator was a company called Everquote.

136. Zander confirmed that he was with CIA.

137. Zander stated that he was sending an email to Plaintiff with a quote for auto insurance. Plaintiff received an email from State Farm, identifying Michael Church as the agent, with a quote for auto insurance.

Calls 11-17

138. While Plaintiff was engaged with Call 10, Defendant EverQuote or its agent initiated telephone calls to Plaintiff's 00 Number and 21 Number, as follows:

| Call | Time | Pltf's No. | Caller ID | Duration |
|---|---|---|---|---|
| 11 | 4:55 P.M.<br>16:55:55 | 00 | 308-300-9897<br>NORTH JULESB NE | 0 min. 7 secs. |

| | | | | |
|---|---|---|---|---|
| 12 | 4:56 P.M.<br>16:56:13 | 21 | 203-774-9180<br>WALLINGFORD CT | 1 min. 2 secs. |
| 13 | 4:56 P.M.<br>16:56:16 | 00 | 308-300-9897<br>NORTH JULESB NE | 0 min. 5 secs. |
| 14 | 4:56 P.M.<br>16:56:54 | 21 | 308-300-9897<br>NORTH JULESB NE | 1 min. 6 secs. |
| 15 | 4:57 P.M.<br>16:57:34 | 21 | 203-774-9180<br>WALLINGFORD CT | 1 min. 2 secs. |
| 16 | 4:58 P.M.<br>16:58:08 | 21 | 308-300-9897<br>NORTH JULESB NE | 1 min. 6 secs. |
| 17 | 5:02 P.M.<br>17:02:47 | 21 | 308-300-9897<br>NORTH JULESB NE | 1 min. 6 secs. |

139. Because Plaintiff was occupied with Call 10, Plaintiff was unable to answer any of Calls 11 through 17.

<u>Call 18</u>

140. On February 10, 2026, at 5:09 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 21 Number.

141. The caller identification number displayed was 308-300-9897, and the caller identification name displayed was NORTH JULESB NE.

142. Yes, Mr. Kevin. The verification is completed now. I can see it in my system. You are qualified now. My God. Please take the confirmation number from my side. Please write down the confirmation number I am going to give you right

now. 786786. Please give this to the UPS guy, who is going to come to your house to deliver the check. The UPS guy is coming – hold on – the 13th of February, Friday."

143. Marshall then explained that Plaintiff was qualified for more benefits, and that his benefits will now be $5,000.00 and senior citizen benefits and health benefits, all Plaintiff had to do was complete another survey call. Marshall then stated that he was going to call back from his other line.

Call 19

144. On February 10, 2026, at 5:14 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 21 Number.

145. The caller identification number displayed was 203-774-9180, and the caller identification name displayed was WALLINGFORD CT.

146. The incoming call rang one time. Plaintiff answered the call and nobody was on the other end of the line. The total call duration was approximately six seconds.

Call 20

147. On February 10, 2026, at 5:15 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 21 Number.

148. The caller identification number displayed was 203-774-9180, and the

caller identification name displayed was WALLINGFORD CT.

149. Once again, John Marshall was on the line. Marshall stated that he was not going to process Plaintiff for senior citizen, hospital and Medicare benefits – more than $1,500.00 – and then coached Plaintiff how he was to answer questions once transferred.

150. Once again, Plaintiff was transferred to a recording which stated that "no agent was available." Plaintiff hung up.

<u>Call 21</u>

151. On February 10, 2026, at 5:25 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 21 Number.

152. The caller identification number displayed was 203-774-9180, and the caller identification name displayed was WALLINGFORD CT.

153. Once again, John Marshall on the line. Marshall stated that he was going to call back in the morning to track Plaintiff's check. Marshall inquired if Plaintiff was receiving SSI or SSDI benefits. Marshall then explained that Marshall can assist Plaintiff receive money every month without doing anything, and then transferred Plaintiff to another telemarketer who identified himself as "Agent Carter with the SSDI Department." The call then terminated.

<u>Call 22</u>

154. On February 10, 2026, at 5:29 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 21 Number.

155. The caller identification number displayed was 203-774-9180, and the caller identification name displayed was WALLINGFORD CT.

156. Plaintiff was occupied at the moment and unable to answer the call.

Call 23

157. On February 10, 2026, at 5:30 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 21 Number.

158. The caller identification number displayed was 308-300-9897, and the caller identification name displayed was NORTH JULESB NE.

159. The caller identified himself as "Agent Carter with the SSDI Department." Carter stated that he worked for the Government. Carter explained that the Government had changed the regulations and if Plaintiff had migraines or joint pain, Plaintiff can receive a check of $700 each month. Carter stated that Plaintiff was qualified for SSDI. Carter stated that he was going to call back tomorrow to enroll Plaintiff in SSDI.

Call 24

160. On March 10, 2026, at 12:26 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 56 Number.

161. The caller identification number displayed was 407-664-2711, with no caller identification name information.

162. Upon answering the incoming call by saying "hello," Plaintiff noted a click sound followed by 5 seconds of silence, and then a male voice asked "Am I speaking indeed to you?... This is Carlos from Everquote calling on a recorded line.... I have the Brian West Agency on the line waiting to give you a quote."

163. The call was then transferred to a female who answered the line "Thank you for calling Brian West State Farm, this is Brittney, how can I help you?" Carlos introduced Plaintiff to Brittney, and informed Brittney of Plaintiff's 56 Number.

164. Brittney then transferred Plaintiff to Viviana. Once again, Carlos introduced Plaintiff to Viviana.

165. Plaintiff asked Viviana for the name of her agency and telephone number. Viviana stated that she was with State Farm and that her telephone number was 321-872-0123.

166. Plaintiff confronted Viviana regarding receiving multiple unwanted telephone solicitation calls. Viviana stated that Plaintiff put in a written request for an insurance quote and they were calling in response thereto. Plaintiff informed Viviana that he did not fill out any form online.

167. Plaintiff asked the name of the lead generator responsible for the call and

informed Viviana that Plaintiff intended to bring a lawsuit under the TCPA and the FTSA. Viviana stated that the call was transferred to her by Everquote.

168. Plaintiff asked for Viviana's office address; Viviana hung up on Plaintiff.

169. Plaintiff's 56 Number bears a Florida 407 area code and is Plaintiff's Florida number, though answerable at Plaintiff's Michigan residence through VoIP service. Defendants' March 10, 2026 calls to that 56 Number from Florida area codes were directed to Plaintiff's Florida-area-code number as part of a Florida-connected telephonic sales campaign.

<u>Call 25</u>

170. On March 10, 2026, at 12:27 P.M., Defendant SAG or its agent initiated a telephone call to Plaintiff's 56 Number.

171. The caller identification number displayed was 407-553-5716, and the caller identification name displayed was PCH.

172. Call 25 came in while Plaintiff was engaged in Call 24, thus Plaintiff was unable to answer the incoming call.

<u>Call 26</u>

173. On March 10, 2026, at 12:34 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 56 Number.

174. The caller identification number displayed was 407-783-6614, and the caller identification name displayed was EVERQUOTE.

175. Plaintiff answered the call on the second ring by saying "hello," but the caller had terminated the call; the total elapsed time from call initiation to the termination by the caller was approximately 9 seconds.

Call 27

176. On March 10, 2026, at 12:35 P.M., Defendant EverQuote or its agent initiated a telephone call to Plaintiff's 56 Number.

177. The caller identification number displayed was 407-783-6614, and the caller identification name displayed was EVERQUOTE.

178. Upon answering the incoming call by saying "hello," Plaintiff noted approximately a 4 second delay before a live agent came on the line and identified herself as "Briana Aguilar from Everquote on a recorded line and it's about an auto insurance quote on the Nissan Rogue. By any chance, sir, are you also part of that auto insurance policy? I do now have your insurance agent from Surety Auto Group and they are ready to give you that quote. May I know your name so that I may address you properly, sir?" Plaintiff provided the false name of Thomas.

179. Aguilar had some apparent difficulty transferring Plaintiff, going through at least 6 failed call transfer attempts. Finally, Aguilar stated that it seems as if the

agents are all busy at this time, but "do not worry" that they will call back later when they are not busy.

180. Plaintiff asked Aguilar for a copy of EverQuote's written do not call policy. Aguilar stated that she could not do that, but that she would put Plaintiff's telephone number on their do not call list. Plaintiff asked Aguilar to do that.

181. Plaintiff asked Aguilar's company location, but Aguilar would only state Cambridge, Massachusetts. Plaintiff asked for an address, Aguilar stated she could not provide it.

Call 28

182. On March 10, 2026, at 1:06 P.M., Defendant SAG or its agent initiated a telephone call to Plaintiff's 56 Number.

183. The caller identification number displayed was 407-553-5740, and the caller identification name displayed was PCH.

184. Upon Plaintiff answering the incoming call by saying "hello," Plaintiff noted a delay of approximately 3 seconds before a recorded message was heard stating "My name is Jen with Surety Auto, are you looking for an insurance quote?".

185. In order to better identify the caller, Plaintiff feigned interest by saying "yes."

186. Plaintiff was then transferred to a live telemarketer who identified

himself as Lucian with Rainbow Insurance. Lucian commenced asking prequalifying questions.

187. Plaintiff asked for Lucian's callback number; Lucian provided 954-361-6549.

188. Subsequent to the termination of the call, Plaintiff dialed the number provided by Lucian (954-361-6549) to make a do not call demand. The call was answered by a recorded message saying "Thank you for calling the offices of Rainbow Insurance and Surety Auto Group."

<u>Call 29</u>

189. On March 10, 2026, at 4:14 P.M., Defendant SAG or its agent initiated a telephone call to Plaintiff's 56 Number.

190. The caller identification number displayed was 407-553-5704, and the caller identification name displayed was PCH.

191. Upon Plaintiff answering the incoming call by saying "hello," Plaintiff noted a delay of approximately 3 seconds before a recorded message was heard stating "My name is Jen with Surety Auto, are you looking for an insurance quote?".

192. In order to better identify the caller, Plaintiff feigned interest by saying "sure."

193. Plaintiff was then transferred to a live telemarketer who identified

himself as Rauncha (phonetic) with Surety Auto. Rauncha commenced asking prequalifying questions.

194. When Plaintiff asked again what agency, Rauncha responded Rainbow Insurance.

195. Plaintiff asked for Rauncha's call back number; Rauncha hung up.

<u>Confrontation Calls</u>

196. Immediately after being hung up on, Plaintiff researched on the Internet for Rainbow Insurance and found a telephone number (954-977-0047).

197. On March 10, 2026, at 4:19 P.M., Plaintiff dialed telephone number 954-977-0047.

198. The call was answered by a recorded message stating "You have reached the offices of Rainbow Insurance, Surety Auto Group, and Four Points Auto."

199. Plaintiff was connected to a receptionist and asked to speak with Rauncha. The receptionist stated that Rauncha was busy.

200. Plaintiff explained to the receptionist that Plaintiff was receiving unwanted telemarketing calls from Surety Auto Group and wanted to put a stop to them.

201. The receptionist explained that they have an automatic dialer and that Plaintiff must have filled out an online form. Plaintiff made clear that he had not

filled out any form.

202. Plaintiff asked for the company's address; the receptionist placed Plaintiff on hold for approximately 6 minutes. The receptionist came back online, and instead of providing a company address, informed Plaintiff that they had no record of calling Plaintiff.

203. The receptionist placed Plaintiff on hold for another 3 minutes, and now stated that they did call Plaintiff 3 times because Plaintiff had filled out a form for a quote earlier that day. The receptionist (who identified herself as Jonicia) claimed she had no access to the form.

204. Plaintiff asked Jonicia to be provided with a copy of their written do-not-call policy. Jonicia stated that Plaintiff would have to ask a manager for that.

205. On March 10, 2026, at approximately 7:17 P.M., Plaintiff received a telephone call to Plaintiff's 56 Number from an individual identifying himself as Philip Barreto, the general manager of SAG.

206. The caller identification number displayed was 754-778-5953, and the caller identification name displayed was PCH.

207. During this confrontation call, Barreto stated that they utilize a third party lead generator to live transfer calls to SAG.

208. Barreto stated that his company has initiated over 100 million robocalls

and that this is the first time they had been caught violating the TCPA.

209. Upon Plaintiff pointing out that the calls Plaintiff received from SAG showed the name PCH in the caller identification name information, including the call from Barreto, Barreto admitted that he knew that incorrect information was being displayed.

210. Barreto ultimately identified his lead generator as being Everquote.

211. Plaintiff also initiated separate calls to Church and West to complain about the telemarketing calls received. In both instances, Church and West disclosed that EverQuote was the lead generator that had supplied the leads to them, and that EverQuote was one of a limited number of lead generators that State Farm had approved for their use.

**COUNT I**
**TCPA - 47 C.F.R. § 64.1200(a)(1)(iii)**

212. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

213. Each of Calls 1 through 29 violated the TCPA, specifically 47 C.F.R. § 64.1200(a)(1)(iii), because Defendants, or persons acting on their behalf, initiated telephone calls, other than for emergency purposes and without the prior express consent of the called party, using an automatic telephone dialing system, to telephone numbers assigned to a service for which Plaintiff is charged for the call.

214. The aforesaid violations of the TCPA were willful and/or knowing as is evidenced by the repetitive number of calls and violations.

**COUNT II**
**TCPA - 47 C.F.R. § 64.1200(a)(2)**

215. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

216. Each of Calls 1 through 29 violated the TCPA, specifically 47 C.F.R. § 64.1200(a)(2), because Defendants, or persons acting on their behalf, initiated or caused to be initiated telephone calls that included or introduced an advertisement or constituted telemarketing, using an automatic telephone dialing system, to telephone numbers assigned to a service for which Plaintiff is charged for the call, without Plaintiff's prior express written consent.

217. The aforesaid violations of the TCPA were willful and/or knowing as is evidenced by the repetitive number of calls and violations.

**COUNT III**
**TCPA - 47 C.F.R. § 64.1200(a)(3)**

218. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

219. Each of Calls 28 and 29 violated the TCPA, specifically 47 C.F.R. § 64.1200(a)(3), because Defendants, or persons acting on their behalf, initiated or

caused to be initiated telephone calls to Plaintiff's residential line using an artificial or prerecorded voice to deliver a message that included an advertisement or constituted telemarketing, without Plaintiff's prior express written consent and in the absence of any emergency.

220. The aforesaid violations of the TCPA were willful and/or knowing as is evidenced by the repetitive number of calls and violations.

**COUNT IV**
**TCPA - 47 C.F.R. § 64.1200(a)(6)**

221. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

222. Each of Calls 2, 3, 6, 11, 13, 19, and 26 violated the TCPA, specifically 47 C.F.R. § 64.1200(a)(6), because Defendants, or persons acting on their behalf, disconnected unanswered telephone calls before at least fifteen (15) seconds or four (4) rings had elapsed.

223. The aforesaid violation was willful or knowing.

**COUNT V**
**TCPA - 47 C.F.R. § 64.1200(c)(2)**

224. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

225. Each of Calls 1, 2, 3, 6, 7, and 24 through 29 violated the TCPA, specifically 47 C.F.R. § 64.1200(c)(2), because Defendants, or persons acting on their behalf, initiated telephone solicitations to Plaintiff's 00 Number and 56 Number while

those numbers were listed on the National Do-Not-Call Registry.

226. The aforesaid violations were willful or knowing.

**COUNT VI**
**TCPA - 47 C.F.R. § 64.1200(d)**

227. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

228. The fact that Defendants, or persons acting on their behalf, failed to institute and maintain proper procedures for maintaining a do-not-call list is evidenced by, among other things, the repeated continuation of calls after Plaintiff's requests not to be called, the failure to provide the required written do-not-call policy upon demand, and the continuation of calls after Plaintiff requested placement on the caller's internal do-not-call list.

229. Each of Calls 1 through 29 violated the TCPA, specifically 47 C.F.R. § 64.1200(d), because Defendants, or persons acting on their behalf, failed to institute procedures for maintaining a list of persons who request not to receive telemarketing calls made by or on behalf of the person or entity.

230. The aforesaid violations were willful and/or knowing.

**COUNT VII**
**TCPA - 47 C.F.R. § 64.1200(d)(1)**

231. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

232. Call 27 violated the TCPA, specifically 47 C.F.R. § 64.1200(d)(1),

because Defendants, or persons acting on their behalf, failed, upon demand, to provide Plaintiff with a copy of the written policy for maintaining a do-not-call list.

233. The aforesaid violations were willful or knowing.

**COUNT VIII**
**TCPA - 47 C.F.R. § 64.1200(d)(3)**

234. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

235. Each of Calls 28 and 29 violated the TCPA, specifically 47 C.F.R. § 64.1200(d)(3), because Defendants, or persons acting on their behalf, failed to record and honor Plaintiff's request, made during Call 27, that EverQuote and the persons to whom it was transferring the lead cease calling Plaintiff.

236. The aforesaid violations were willful or knowing.

**COUNT IX**
**TCPA - 47 C.F.R. § 64.1200(d)(4)**

237. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

238. Each of Calls 1 through 29 violated the TCPA, specifically 47 C.F.R. § 64.1200(d)(4), because Defendants, or persons acting on their behalf, failed to provide the called party, during or after the message, with the name of the individual caller, the name of the person or entity on whose behalf the call was being made, and a telephone number or address at which such person or entity could be contacted.

239. The aforesaid violations were willful or knowing.

**COUNT X**
**TCPA - 47 C.F.R. § 64.1601(e)**

240. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

241. Each of Calls 1 through 25, and 28 through 29 violated the TCPA, specifically 47 C.F.R. § 64.1601(e), because Defendants failed to transmit meaningful caller identification information, including by transmitting caller identification information that was false, misleading, incomplete, or non-identifying. The names displayed included "KATIE BUSZ," "WALLINGFORD CT," "NORTH JULESB NE," and "PCH," none of which consistently or truthfully identified the actual individual caller or the person or entity on whose behalf the call was being placed.

242. Defendants' violations were willful and/or knowing.

**COUNT XI**
**MHSSA**

243. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

244. Plaintiff's 00 Number and 56 Number were residential telephone numbers used for personal, family, and household purposes, and were listed on the National Do-Not-Call Registry at all times relevant hereto.

245. Defendants, and each of them directly and/or through their agents and persons acting on their behalf, made or caused to be made telephone solicitations to Plaintiff in Michigan for the purpose of generating, qualifying, and transferring

Plaintiff as an insurance prospect for the sale of insurance products.

246. Each of Calls 1, 2, 3, 6, 7, and 24 through 29 violated the MHSSA, including M.C.L. § 445.111a, because Defendants, or persons acting on their behalf, made telephone solicitations to Plaintiff while Plaintiff's residential telephone numbers were listed on the federal do-not-call registry.

247. Defendants further violated the MHSSA by using recorded messages in connection with telephone solicitations, including, among others, the recorded transfer and quote messages heard during Calls 5, 8, 24, 28, and 29, and by failing to properly identify themselves and the organization on whose behalf the solicitations were made.

248. By reason of the foregoing violations of the MHSSA, Plaintiff suffered loss and injury, including invasion of privacy, nuisance, occupation of his telephone lines, and the consumption of telephone service for which Plaintiff is charged.

249. Pursuant to M.C.L. § 445.111c(3), Plaintiff is entitled to recover actual damages or statutory damages of $250.00 per violation, whichever is greater, together with reasonable attorney fees and costs as allowed by law.

**COUNT XII**
**FTSA**

250. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

251. Plaintiff is domiciled in Orange County, Florida. Plaintiff's 56 Number bears a Florida 407 area code and is Plaintiff's Florida telephone number, though

answerable at Plaintiff's Michigan residence through VoIP service.

252. Defendants EverQuote, BWIA, SAG, Mobley, West, and Barreto, directly and/or through their agents and persons acting on their behalf, initiated or caused to be initiated telephonic sales calls to Plaintiff's 56 Number in Calls 24 through 29, and those calls originated from Florida area codes.

253. Calls 24 through 29 constituted telephonic sales calls and unsolicited telephonic sales calls within the meaning of Fla. Stat. § 501.059 because they were made for the purpose of soliciting the sale of insurance goods or services, or obtaining information that would be used for the direct solicitation of such sale.

254. Each of Calls 24 through 29 violated the FTSA because Defendants, or persons acting on their behalf, made or knowingly allowed to be made unsolicited telephonic sales calls using an automated system for the selection and dialing of telephone numbers and/or the playing of a recorded message when a connection was completed, without Plaintiff's prior express written consent.

255. Defendants further violated the FTSA by failing to transmit, or causing not to be transmitted, accurate caller identification information, including the use of the caller-identification name "PCH" rather than the true identity of the calling party.

256. Plaintiff did not provide prior express written consent to receive such telephonic sales calls from Defendants or anyone acting on their behalf.

257. The aforesaid FTSA violations were willful and/or knowing.

258. Pursuant to Fla. Stat. § 501.059, Plaintiff is entitled to injunctive relief and to recover actual damages or $500.00 per violation, whichever is greater, and treble damages for any willful or knowing violations.

**COUNT XIII**
**MCPA**

259. Plaintiff repeats and realleges the allegations contained in Paragraphs 1 through 210 as though fully set forth herein.

260. Defendant EverQuote, and to the extent not exempt under M.C.L. § 445.904 the remaining Defendants, engaged in trade or commerce within the meaning of the Michigan Consumer Protection Act by marketing, generating, purchasing, selling, and transferring consumer insurance leads for commercial gain. The MCPA prohibits unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce and provides a private cause of action for a person who suffers loss as a result of such conduct.

261. In the course of such trade or commerce, Defendants engaged in unfair, unconscionable, or deceptive methods, acts, or practices, including but not limited to: causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or affiliation of the calls and offered services; representing that the calls were associated with governmental benefits, subsidies, or departments when in truth

they were part of a commercial insurance lead-generation scheme; representing that Plaintiff had been selected to receive monetary, health, dental, SSDI, or other benefits as a pretext for telemarketing; failing to reveal the material fact that the true object of the calls was to generate and transfer Plaintiff as an insurance lead; and instructing Plaintiff to falsely tell the downstream insurance seller that Plaintiff had seen a Google advertisement rather than been transferred through the telemarketing chain.

262. More specifically, Defendants falsely claimed or implied that they were connected with the "United States Subsidy Benefits Department," a federal government agency, calling about the "Protect America" program, government checks, SSDI benefits, and other public-benefits programs, when in fact the calls were being used to funnel Plaintiff into insurance lead transfers to EverQuote customers and State Farm-affiliated sellers.

263. Each of Calls 1 through 29 constituted a separate deceptive act or practice in violation of M.C.L. § 445.903. Each answered call, each prerecorded-message call, and each call transmitting misleading caller-identification information constituted a separate deceptive act or practice. To the extent certain calls were abandoned before a live interaction occurred, Plaintiff pleads those calls as part of the overall deceptive scheme and seeks recovery for them under the MCPA insofar as they transmitted misleading source-identification information or otherwise

conveyed deceptive content.

264. As a direct and proximate result of these deceptive methods, acts, and practices, Plaintiff suffered injury and loss, including invasion of privacy, nuisance, occupation of his telephone lines, consumption of charged telephone service, and the expenditure of time and effort dealing with the unlawful calls.

265. Pursuant to M.C.L. § 445.911, Plaintiff seeks actual damages or $250.00 for each violation, whichever is greater, together with reasonable attorney fees.

266. Plaintiff pleads this Count against the insurance defendants in the alternative and only to the extent their conduct is not exempt from the MCPA under M.C.L. § 445.904.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in favor of Plaintiff and against Defendants, jointly and severally to the extent permitted by law, and award the following relief:

A. Statutory and actual damages as follows:

1. TCPA damages

Count I: 29 violations × $500.00 = $14,500.00

Count II: 29 violations × $500.00 = $14,500.00

Count III: 2 violations × $500.00 = $1,000.00

Count IV: 7 violations × \$500.00 = \$3,500.00

Count V: 11 violations × \$500.00 = \$5,500.00

Count VI: 29 violations × \$500.00 = \$14,500.00

Count VII: 1 violation × \$500.00 = \$500.00

Count VIII: 2 violations × \$500.00 = \$1,000.00

Count IX: 29 violations × \$500.00 = \$14,500.00

Count X: 27 violations × \$500.00 = \$13,500.00

TCPA subtotal: 166 violations = \$83,000.00

TCPA trebled for willful and/or knowing violations: \$249,000.00

2. MHSSA damages

Count XI: 13 violations × \$250.00 = \$3,250.00

Or actual damages, whichever is greater, plus attorney fees and costs.

3. FTSA damages

Count XII: 6 violations × \$500.00 = \$3,000.00

and, if found willful or knowing, up to \$9,000.00.

4. MCPA damages

Count XIII: 29 violations × \$250.00 = \$7,250.00

or actual damages, whichever is greater, plus reasonable attorney

fees.

B. Liquidated statutory damages presently claimed:

Base statutory total: $96,500.00

Maximum statutory total if TCPA and FTSA violations are trebled: $268,500.00.

C. An award of taxable costs and disbursements incurred in the filing and prosecution of this action;

D. Reasonable attorney fees where authorized by statute;

E. Injunctive relief enjoining Defendants and persons acting on their behalf from initiating further unlawful telemarketing calls to Plaintiff's telephone numbers;

F. Interest from the date of filing at the statutory rate; and

G. Such other and further relief as the Court deems just and proper.

Respectfully submitted,

Dated: March 19, 2026

Mark W. Dobronski
Post Office Box 99
Dexter, Michigan 48130-0099
Telephone: (734) 641-2300
Email: markdobronski@yahoo.com
Plaintiff *In Propria Persona*